Judgment rendered July 22, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 57,011-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
N.P.

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 4983

Honorable Amy Burford McCartney, Judge

* * * * *

| | |
|---|---|
| ROBERT IRVIN THOMPSON, III | Counsel for Appellant, Naydeen Fredrick |
| LAW OFFICE OF BRYCE DENNY, LLC By: Andrew B. Freyer | Counsel for Appellant, Heriberto Perez |
| PAMELA ROXANNE MOSER Assistant District Attorney | Counsel for Appellee, State of Louisiana |
| KIMBERLY S. SMITH | Counsel for Appellee, State of Louisiana DCFS |
| ACADIANA LEGAL SERVICES CORPORATION By: Jacqueline Chevette Williams | Counsel for Appellee, N.P. |

* * * * *

Before STONE, THOMPSON, and ROBINSON, JJ.

**STONE, J.**

This appeal arises from the Second Judicial District Court, the Honorable Amy McCartney presiding. The court rendered a judgment of permanent guardianship to the foster parents of NP (a Hispanic female born in the U.S. Virgin Islands on October 12, 2022), left visitation of the biological father, Heriberto Perez ("Mr. Perez"), to the discretion of the foster parents, and banned the visitation of the biological mother, Naydeen Fredrick ("Ms. Fredrick"). Mr. Perez and Ms. Fredrick separately appeal that judgment and have filed separate briefs as well. The district attorney and the attorney appointed for NP have also filed briefs. For the reasons stated herein, we reverse in part, affirm in part, and render judgment.

## FACTS AND PROCEDURAL HISTORY

**Factual background of removal, CINC[1] adjudication**

Mr. Perez and Ms. Fredrick were residents of the U.S. Virgin Islands (the "Virgin Islands") when NP was born. They lived together as a couple for roughly a year prior NP's birth and continued to live together as a family unit for four to five months afterward. Mr. Perez was active in the daily care of NP. In January or February of 2023, the domestic relationship between the couple terminated — and apparently Ms. Fredrick took NP with her.

By April of 2023, Ms. Fredrick had a new boyfriend, Shamol Granville ("Mr. Granville"). According to Mr. Perez, in June or July of 2023, he (Mr. Perez) was arrested pursuant to Ms. Fredrick's accusations — as he described — for property damage, burglary, and domestic violence (all with Ms. Fredrick as the victim). Mr. Perez maintains that these were false

---

[1] Child In Need of Care.

accusations, and later the charges were in fact "dismissed with prejudice"[2] by the Virgin Islands authorities. However, Ms. Fredrick obtained a Virgin Islands restraining order against Mr. Perez which was still in effect throughout the trial court proceedings herein.[3] He was still in jail when Ms. Fredrick absconded to Texas with her new boyfriend, Mr. Granville, and NP in October 2023.

Ms. Fredrick alleged that since January 2, 2024, she and NP had been riding with Mr. Granville, a trucker, on his work trips. On January 24, 2024, the three were headed to Baton Rouge from Dallas, Texas, and stopped at a Luv's truck stop in Desoto Parish. Ms. Fredrick testified that she was inside Luv's taking a shower while Mr. Granville and 15-month-old NP were left in the truck. She also affirmed that nobody else was in the truck or otherwise had access to NP.

According to Mr. Granville, he sat in the front seat of the truck playing on his phone while NP was inside the cabin on the bed. He alleged that he heard NP hit the cabin floor of his 18-wheeler and found her unresponsive. Mr. Granville rushed NP into the store and sought emergency medical attention for her.[4]

---

[2] This terminology is reflected in an official home study report by Virgin Islands Department of Human Services in evaluating Mr. Perez's suitability as a caretaker. The report was introduced into evidence and is a part of the record.

[3] The restraining order is *not* in the record of this case but was acknowledged by Mr. Perez and Ms. Fredrick. No further details — such as the allegations or findings on which the order is based — are contained in the record. There is no indication that NP is a protected party in the order. On the contrary, there is no reported or alleged child abuse attached to Mr. Perez's name per the Virgin Islands home study report.

[4] On September 16, 2025, Mr. Granville was arrested for second degree cruelty to a juvenile in connection with the incident. NP's preschool teacher reported that NP is scared of 18-wheelers.

At the hospital, NP was determined to have four skull fractures and three brain bleeds — these injuries were nearly fatal. Additionally, NP suffered a broken arm and bruising around her mouth. Ms. Fredrick admitted that the bruising was from January 22, 2024, when she squeezed her NP's face trying to make the child open her mouth and eat a piece of meat. The X-rays also showed older untreated skeletal injuries which included a broken leg and spinal fractures (i.e., which pre-existed the head trauma that NP suffered on January 24, 2024). Ms. Fredrick claimed she did not know about these older injuries. Prior to the January 24, 2024, incident, these injuries were never treated or disclosed to anyone. According to the DCFS[5] supervisor, Kim Carleton ("Ms. Carleton"), the trauma nurse informed her and Ms. Fredrick that NP's head injuries could not have happened from merely falling two to three feet from the bed to the floor of the truck sleeping cabin, and that someone must have done this to NP with physical violence — likewise, "non-accidental trauma" is how Ms. Carleton said the doctors described it. Ms. Fredrick, however, testified (at the permanency hearing) that her daughter's near-fatal, non-accidental, head trauma was the result of the child falling off the bed in the 18-wheeler. On January 24, 2024, the DCFS obtained an emergency instanter order for the removal of NP and, shortly thereafter, instituted CINC proceedings and placed NP in the custody of DCFS-certified foster parents who reside in Shreveport, Louisiana.

---

[5] Louisiana Department of Children and Family Services.

**Ms. Fredrick – subsequent conduct**

During her testimony at the permanency hearing on January 24, 2025, Ms. Fredrick claimed that, as of February 2024, she terminated her relationship with Mr. Granville, and that he moved to Atlanta while she did not. Problematic for this testimony, (1) Ms. Carleton reported that Ms. Fredrick was still living with Mr. Granville in March of 2024 and was in willful denial that Mr. Granville had injured her baby; and (2) Ms. Fredrick gave birth to two of Mr. Granville's children during the pendency of the CINC proceedings — one born circa August 2024, and another born circa August 2025.[6] Ms. Fredrick, thus, had coitus with Mr. Granville in December 2024 or later, demonstrating that she remained sexually involved with Mr. Granville even though: (1) he was the only person in the truck with NP on January 24, 2024, when NP's non-accidental (nearly fatal) trauma occurred, (2) she agreed — in her case plan — to terminate her relationship with Mr. Granville, and (3) she claimed to have terminated her relationship with Mr. Granville. Ms. Fredrick also contrived a story about her mother having a stroke as an excuse for missing court when, in reality, she attempted to hide her pregnancy with Mr. Granville's baby from the trial court. As of November 2025, both Ms. Fredrick and Mr. Granville are being criminally prosecuted for second degree cruelty to a juvenile in connection with NP's injuries.[7]

---

[6] Ms. Fredrick claimed to have completely terminated her relationship with Mr. Granville by the time she birthed his older child (August 2024) to the degree of only keeping him updated (through a third party) regarding their baby; her giving birth to his younger child roughly one year later suggests otherwise.

[7] For all these reasons, we find that the record contains clear and convincing evidence that NP cannot be safely returned to Ms. Fredrick within a reasonable time (or otherwise). Ms. Fredrick admitted to physically abusing NP herself, and admitted she did not seek treatment for NP's fractured leg and vertebrae, and further, appears unwilling to

**Virgin Islands home study — contents and recommendation**

On August 22, 2024, the DCFS a requested that the Virgin Islands Department of Human Services ("DHS") conduct a Relative Home Study on NP's paternal grandmother, Beatris Lopez ("Ms. Lopez"), after which she filled out an "Application to Care for Child" inquiry packet. The study included not only an inspection of her home, but also an extensive investigation into her background and that of her 75-year-old mother, Colporina Montanez ("Ms. Montanez"), who resides with her.

On March 17, 2025, Ms. Lopez was interviewed by a DHS caseworker and indicated that "her main focus is to have her granddaughter, NP, placed in her home where NP will have the love and care of her family." She is applying for legal custody and permanent placement of NP.

Mr. Perez was also interviewed. He explained that he loves his daughter (NP), wants to help his mother raise NP in St. Croix, and wants NP to grow up with her family there. He is eager for his mother to obtain custody of NP. The DHS worker asked Mr. Perez and his mother about Louisiana's restriction of Mr. Perez's contact with NP to supervised visitation. Mr. Perez said he would respect and follow that restriction even though he did not understand why it was imposed. Ms. Lopez likewise agreed to respect the restriction and supervise her son's visits with NP. Thereupon, the home study was complete and Ms. Lopez was provisionally approved as a permanent placement recommendation, pending *only* the

---

be truthful about the real cause of NP's near-fatal injuries, and remains sexually attracted to and/or involved with the man apparently responsible for almost killing NP — while she (Ms. Fredrick) must realize that her own testimony, if true, demonstrates Mr. Granville is the only possible culprit. For the sake of organization, Ms. Fredrick's appeal is not further discussed herein, but her powerful lack of credibility as a witness is noted.

5

results of the National Crime Information Center ("NCIC") background check. The provisional report and recommendation were sent to the Louisiana Interstate Compact on the Placement of Children ("ICPC") central office on March 28, 2025 — seven months after receipt of the request.[8] The NCIC background checks were completed and reported to DHS on May 12, 2025 — neither Ms. Lopez nor Ms. Montanez had any criminal history.

Mr. Perez did not have any additional criminal history except that which was already known via the Virgin Islands background check: (1) a pending arrest or prosecutorial charge from May 2, 2020, for unauthorized possession of a firearm; (2) a pending arrest or prosecutorial charge from September 1, 2023, for first degree assault; (3) a first degree burglary charge dismissed with prejudice on December 12, 2024; and (4) a simple assault and battery charge (a misdemeanor) also dismissed with prejudice on December 12, 2024.[9]

Furthermore, Ms. Lopez and Ms. Montanez were interrogated under oath and denied having: (i) any criminal history; (ii) ever been the victim or perpetrator of family violence; (iii) ever perpetrated emotional or physical abuse on anyone; (iv) any history of substance abuse or any use of illegal drugs, child abuse, or sexual abuse; (v) any relevant physical, mental, or

---

[8] The report attributes the delay to the paternal grandmother not submitting all the paperwork until February 2025.

[9] If it remains pending now, over a year after the report, the first degree assault charge is concerning — it is a felony that includes wide range of conduct from attempted murder to simple assault with the intent to commit robbery or larceny — and is punishable by 0 to 15 years of imprisonment. There is no narrative whatsoever in the record as to this charge. However, the record does reflect that this charge: (1) was instituted while Mr. Perez was already in jail for the "Ms. Fredrick-related" charges that were dismissed with prejudice; (2) was known to the DHS when it recommended placement with Ms. Lopez; and (3) was or should have been known to the DCFS when it requested that reunification with Mr. Perez be added as a case plan goal (June 17, 2025), and to the Virgin Islands criminal court when it allowed Mr. Perez to travel to DeSoto Parish, Louisiana, to attend court and visit NP despite his bail obligations.

6

emotional health conditions; (vi) knowledge of any family members abusing legal or illegal drugs; or (vii) ownership of any weapons.

Additionally, Ms. Lopez stated that she does not use tobacco or alcohol and disclosed her family history in great detail.[10] She stated that, alongside her son (Mr. Perez), and her mother (Ms. Montanez), three of her daughters would also have regular contact with NP. She further disclosed that her base monthly income (after taxes) is $2,880, and that she works overtime (when available) for additional income as overtime is not guaranteed.

Upon visual inspection, the DHS worker found the home to be quite suitable for housing a minor child in all regards, including safety, cleanliness, size, location, amenities, fixtures, and utilities.

Ms. Lopez was required to send out five character reference forms; all five were returned completed to DHS and all five respondents gave strictly positive feedback: (1) Jamal Browne described her as his "mentor and lifelong friend," stated he observed her interact with her children, and that she is "a respected person in the community" who is always willing to help the less fortunate; (2) Corina Campbell had known Ms. Lopez for over 6 years and reported having observed her interacting with her children, grandchildren, nieces, nephews, and other extended family and that such was always "happy and filled with love and laughter"; (3) Artemeh Woods has known Ms. Lopez for 15 years and described her interactions with friends and family as "loving and caring" and further described her as "kind and

_____

[10] This includes the residence and occupation of (1) all five of Ms. Lopez's children, all of whom live in St. Croix; and (2) all six of her siblings, three of whom reside in St. Croix.

patient with those around her"; (4) Verna Maxwell has known Ms. Lopez for most of her life, interacts with her daily, and is the biological aunt of Ms. Lopez' children. She stated that Ms. Lopez "cares for those she considers family, even when you are not blood related," and that she "is kind and teaches children on being responsible and treating each other kindly and with respect"; (5) Chanice Jarvis has known Ms. Lopez for 11 years and was her direct supervisor at Champs (a former employer) and became a family friend; she stated that Ms. Lopez "is gracious and makes you feel welcome" and that she "observed her [Ms. Lopez] interacting with her children, grandchildren, and her cousins, big or small, with love and compassion" and is "well-equipped with the skills needed to care for a child," and that is especially so because Ms. Lopez "plays an active role in her family's lives."

Ms. Lopez was also required to undergo a physical and mental examination, which did not reveal any condition that would derogate from her ability to care for NP. The evaluator stated that she appears mentally, physically, and emotionally "stable and suitable to proceed with the minor's care."

Based on all the information — including the suitable financial condition of Ms. Lopez — the DHS formally recommended permanent placement of NP with the paternal grandmother (Ms. Lopez) to the Louisiana authorities on May 28, 2025. (Hereinafter, the "ICPC report" or "ICPC report and recommendation.")

The ICPC report also included an addendum home study on Mr. Perez, which was included in the March 28, 2025, provisional recommendation. His dwelling – a "container home" – is on the same tract

8

as his mother's (Ms. Lopez's) home. Mr. Perez admitted that he has too little space for NP to live with him, and the DHS agreed.

**Mr. Perez's case plan**

The case plan required Mr. Perez to: (1) obtain and maintain housing that is free from all safety hazards; (2) attend domestic violence classes; (3) submit to a parenting assessment; (4) "attend substance abuse and comply with all recommendations"; (5) complete random drug screens; (6) attend and complete Trust-Based Relational Intervention ("TBRI") Training; (7) attend anger management classes; and (8) maintain contact with DCFS in regard to case plan progress/lack of progress.

**Outline of the proceedings**

As a preface, we note that the DCFS caused months of unnecessary delay, arbitrarily dismissed the Virgin Islands DHS recommendation of permanent placement with Ms. Lopez, and unreasonably stifled Mr. Perez's visitations with NP. In his efforts to contend with this capricious and dilatory bureaucracy, Mr. Perez had six different attorneys assigned to him throughout the course of these proceedings. This profound lack of continuity created a lack of familiarity with the case on the part of the respective attorneys. As a result, these attorneys were inactive and passive rather than assertive or proactive.[11]

---

[11] There is only one notable exception to this statement: Mr. Hill, who was counsel for the first few hearings, requested that Mr. Perez be granted supervised visitation, and the trial court granted that request (but later revoked it per the DCFS request, despite the fact that no change of circumstances had occurred).

Otherwise, nowhere did they attempt to meaningfully cross-examine the DCFS witnesses. Nor did these attorneys make one objection or even file one motion or brief throughout entire course of the trial court proceedings. They did not attempt to redirect the court and the DCFS back to the (Virgin Islands) DHS recommendation of permanent placement with Ms. Lopez. They did not challenge any of the actions or positions of the trial court or the DCFS by oral argument or by writ applications to this court. The accuracy of these statements is demonstrated in the remainder of this section of the opinion.

At the continued custody hearing on January 29, 2024, Mr. Perez was present via Zoom and was represented by Mr. Weber Hill ("Mr. Hill") of the Public Defender's Office. At the appearance to answer hearing on February 14, 2024, Mr. Perez was present in person and was, again, represented by Mr. Hill. Mr. Perez indicated on the record that he wanted custody of NP to be granted to his mother, Ms. Lopez, in St. Croix. In fact, Ms. Lopez accompanied Mr. Perez to Louisiana and together had a DCFS-supervised visit with NP — which Ms. Carleton personally observed and said it (meaning the visit) "went well." She also noted that NP was "very bonded" with the foster mother, seeming to prefer her over Mr. Perez during the visitation.

As of the CINC adjudication on March 12, 2024, NP had not fully recovered from her injuries. Mr. Perez was represented by Mr. Brian McRae ("Mr. McRae") at this hearing and was present by Zoom. In her testimony, Ms. Carleton (the DCFS supervisor) recommended a case plan goal of adoption only, and that the DCFS would "start working on the termination process, TPR," but had told Mr. Perez that he "can still work a case plan." When asked why this recommendation as to Mr. Perez, Ms. Carleton stated that "[NP] hasn't seen him since July [2023]," and he "was incarcerated in St. Croix for domestic violence against the mother."[12]

Nonetheless, Ms. Carleton testified that Mr. Perez was very willing to work his case plan, was "consistently cooperative," and had obtained NP's immunization record for the DCFS within 24 hours of their request after the

---

[12] We note that once the Fredrick-related arrests had been dismissed with prejudice, the DCFS stated reasons for continuing to deprive Mr. Perez of his child shifted to other matters.

DCFS struggled to get it on their own. Anything the DCFS asked of Mr. Perez, he tried to fulfill.

She also indicated that all the professionals counseling Mr. Perez are in the Virgin Islands and would have to be approved by the DCFS before such could be treated as compliance with the case plan.

The court adjudicated NP a CINC pursuant to La. Ch. C. art. 606(A)(1) in that she:

> is a victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, and that the child was a victim of neglect. And, specifically, the Court makes those findings based upon the significant injuries to the child at the time when—it sounds as though all parties agree that the child was in the custody of the boyfriend of the mother. Also, with respect to the old injuries that were healing, there was apparently neglect as well as abuse that would have caused those injuries as well.

The court also adopted the DCFS proposed case plan, which suspended Mr. Perez's ability to visit his daughter. There was no objection to this aspect of the case plan.

The disposition hearing took place on April 9, 2024. Mr. Perez was present by Zoom and represented by Mr. Hill. NP's foster mother reported that all of NP's injuries had healed by this point. The DCFS caseworker, Shalonda Sanders ("Ms. Sanders"), stated that she had spoken with Ms. Lopez, and that the DCFS "[had not] done anything yet" but, later, probably would be considering her as a possible placement. However, when asked "what is the plan for the next two months?" Ms. Sanders responded that "the plan is for [NP] to stay in the home with…[the foster mother]," and beyond that, the DCFS had "not made any other plans," and that the ICPC packet had not yet been submitted. Ms. Sanders further stated she did not know

11

when it (ICPC packet) would be submitted. The court approved the case plan and ordered that NP be kept in her placement with the foster mother. The ban on Mr. Perez's visitation was continued.

By July 24, 2024, Mr. Perez had completed the anger management and domestic violence courses and stated that he also had completed the parenting course, but the DCFS had not yet received the certificate(s).

The next hearing was a case review on August 13, 2024 — five months *after* Mr. Perez's visitation rights had been suspended. He was present in person and represented by Mr. Hill. Ms. Carleton testified that NP was doing "extremely well" in foster care and apparently had no lasting effects from her injuries. Ms. Carleton indicated that Mr. Perez had been progressing on his case plan through St. Croix service providers, but warned that "oftentimes, the DCFS does not accept or recognize providers for various reasons," and that she had not yet determined whether his providers would be accepted or even spoken with all his providers. Her testimony also suggested that the DCFS had only recently submitted the ICPC packet.

Mr. Perez testified that he had been incarcerated for alleged "domestic violence" against Ms. Fredrick; however, the apparently corresponding charges on his RAP sheet (burglary and misdemeanor simple assault) do not indicate actual physical violence. He stated that Ms. Fredrick "lied to put him in jail,"[13] and that his bail conditions for the (apparently unrelated)

---

[13] Though not definitive proof, this claim is corroborated by the fact that the prosecutorial charges were subsequently dismissed with prejudice, and by the fact that Ms. Fredrick has demonstrated a deeply troubling lack of credibility in this record. See notes 6 and 7, *supra*. According to the ICPC report, however, there remains a first-degree assault charge that was still pending against Mr. Perez as of May 28, 2025. He testified that all the charges based on Ms. Fredrick's allegations were dismissed with prejudice. If true, that means the still-pending assault charge is unrelated. This testimony was not challenged.

12

charge that had not been dismissed allowed him travel provided he obtain court approval before each trip.

Upon Mr. Hill's request, the court allowed supervised visitation for Mr. Perez and his mother, Ms. Lopez, who had accompanied him again and rented a car to travel from Bossier City to the courthouse in Mansfield. Ms. Carleton initially opposed his visitation with NP but reversed her position in open court after the district attorney went off-script and praised Mr. Perez for making an "extraordinary effort" to attend the hearings.

The trial court held a permanency hearing on January 14, 2025, and Mr. Perez was present in person and represented by Mr. McRae. By that point, he had completed the TBRI training and parenting courses. Ms. Sanders testified that Mr. Perez "contacts the office all the time [and] is doing well," and "doing everything the agency has asked of him" in a timely fashion. The trial court agreed. Ms. Sanders also reported that Mr. Perez and Ms. Lopez had been contacting NP via phone calls to the foster mother. Mr. Perez testified that his two Fredrick-related charges had been dismissed with prejudice and that he had emailed proof thereof to the DCFS.[14] He also testified that he had finished his case plan except he had not yet finished all the random drug screens. Mr. McRae used Mr. Perez's testimony as an opportunity to advise him to be "very proactive" in goading the DHS to move as quickly as possible to complete the ICPC report.

However, the court also determined that Mr. Perez tested positive for marijuana ("THC") that day *without any testimony or other evidence to that*

---

[14] Here, Mr. Perez stated that the charges dismissed were first degree burglary, disturbing the peace, and destruction of property. He explained that, according to Ms. Fredrick's allegations, he destroyed some of her property while they were living together.

13

*effect in the record.*[15]  Neither the court nor Ms. Sanders said anything suggesting this was a potential roadblock or reason for delaying reunification.  The court did, however, indicate that Mr. Perez would be required to undergo another substance abuse assessment/treatment.

As stated earlier, the Louisiana ICPC Central Office received the finalized ICPC report recommending permanent placement with Ms. Lopez on May 28, 2025.  On June 6, 2025, after a family team meeting, Ms. Carleton updated the case plan to add reunification with the father (Mr. Perez) as a concurrent goal.  She also mentioned in the case plan report that "the ICPC was approved the Agency awaiting on upper management to move forward with the next step.  The Agency is setting up Zoom calls between [Ms. Lopez and NP]."

During the case review hearing on June 17, 2025, Mr. Perez was represented by Mr. Richard Woolbert ("Mr. Woolbert").  Ms. Carleton testified that Mr. Perez had completed his *entire* case plan but did not specify how long before that date he had done so.  The court approved the amendment adding reunification with Mr. Perez as a concurrent case plan goal.  Ms. Carleton acknowledged that at this point Ms. Lopez had traveled to Louisiana to visit NP three times and stated that she [Ms. Carleton] had started talks with the DCFS about bringing NP to the Virgin Islands for a visit with Ms. Lopez or trial placement with her.  There were, however (according to Ms. Carleton), bureaucratic restrictions: the Louisiana DCFS would, if it were to allow this, require that a Louisiana DCFS worker stay for the entire duration and monitor NP's experience in Ms. Lopez's home –

---

[15] For purposes of this appeal, the positive drug screen on this date did not happen because there is no evidentiary basis for it in the record.

to observe how well NP tolerated being placed in a new environment.  Ms. Carleton also explained that she wanted to get NP (then roughly 32 months old) further acquainted with Ms. Lopez through DCFS-monitored Zoom calls before allowing a trip to the Virgin Islands.  The court ordered that DCFS not take NP to the Virgin Islands without first obtaining the court's authorization.  Present by Zoom, Mr. Perez asked why this process was taking so long and intimated that he wanted his daughter to come home soon.  The court responded that Mr. Perez would have to come to Louisiana if he wanted to see his daughter, and that the next court date would be two months later, in August, so he should come then.

Mr. Perez, his mother, and his sister (Ms. Lopez's daughter) traveled from the Virgin Islands to Louisiana to visit with NP around the time of  the August 5, 2025, case review hearing.  On this date, Mr. Perez was represented by Mr. William Eades ("Mr. Eades").  Ms. Carleton testified that the visit the night before the hearing went "very well" and noted Mr. Perez's positive interaction with NP, but did state:

> So, we are trying to make as much effort to get him visits while he is here to attempt to get her familiar with him and his mother. We did do the ICPC on his mother [i.e., completed 2 months earlier]. She's not interacting much with [NP]. So, we have done a Zoom link, which [NP] [still a 2-year-old] did surprisingly well on with the help of Ms. Lala. The father interacted the whole time, the grandmother did not. Then, in the visit last night, he was the one on the floor playing and interacting with her while the grandmother did not have much interaction with her. So, we have some concerns about that.

> So, *we have started* -- we've discussed it with upper management, and *we have started*. We are going to do a home study on the father just to see what's going on with him in St. Croix to be able to possibly end up placing with dad.  (Emphasis added.)

15

It appears from their conversation on the record that Ms. Carleton and the trial court were unaware that the ICPC report indicates that Mr. Perez lives in a separate dwelling on the same tract as his mother's home and includes a study of his home. Ms. Carleton indicated that the DCFS would now begin "digging into" Mr. Perez's finances since now they were now considering direct placement with him — i.e., even though (1) the ICPC report had already disapproved of his home, (2) Mr. Perez repeatedly stated (since his first appearance in the proceedings), in open court and the ICPC report, that *he wanted his mother, Ms. Lopez, to get custody of NP*, and that he wanted to help her raise NP, and (3) the case had already been pending over 18 months.[16]

The trial court asked Ms. Carleton why, given that it had been over 18 months since removal, reunification was still a concurrent case plan goal instead of setting the goal of adoption by the foster parents only? Yet, the trial court had just approved the addition of reunification in the immediately prior hearing, and no circumstances had changed since then except the passage of two months (wherein the DCFS apparently made no progress on the matter). Ms. Carlton responded that the DCFS was still considering giving NP back to her father, rather than making foster adoption the sole objective, because Mr. Perez had "worked his case plan as much as possible," (he had already done so before the previous hearing two months earlier) and the DCFS legal department doubted there were legal grounds for terminating his parental rights. Ms. Carleton added that the DCFS had been

---

[16] Additionally, the DCFS and the court had already set Mr. Perez's support obligation at $15 per month and he had been afforded counsel free of charge throughout the proceedings — which can only be done when the parent is indigent. La. Ch. C. art. 608.

hesitant initially because Mr. Perez was in jail when NP was taken into care, and NP "did not really remember him." Then the following exchange occurred:

> THE COURT: And so how does that balance against her need for permanency after more than a year and a half in care?
> THE WITNESS: So, the department definitely sees both sides. But with him working his case plan, we are not sure that we can——the agency has met with legal, and we are not sure that we are there yet for termination.
> THE COURT: Okay. Which, of course, doesn't bind the Court as far as y'all——as far as the department's requested case plan goal, correct?
> THE WITNESS: Right.
> THE COURT: *Have other options been considered?*
> THE WITNESS: As to the foster parents?
> THE COURT: *Well, as to the permanency for the child.*
> THE WITNESS: The agency cannot recommend guardianship for a child this young. It can be done by the Court, but the agency cannot recommend it. (Emphasis added.)

Ms. Carleton, notably, did not mention permanent placement with NP's grandmother — as recommended by DHS and as requested by the father — in her response to the court's above-emphasized question. Also quite notably, Mr. Perez's stand-in counsel for the day, Mr. Eades, offered no resistance against this disregard of the ICPC report's recommendation of permanent placement with Ms. Lopez, and the father's request that such be done.

The court expressed disinclination toward allowing reunification to remain a concurrent case plan goal but would allow it "for the moment." The foster parents had indicated throughout the case that they would be quite willing to adopt NP if placement with NP's family failed. There was no discussion regarding or in consideration of accepting the DHS

17

recommendation in the ICPC report for placement with Ms. Lopez except what little is reflected in the preceding paragraphs.

On October 14, 2025, the court held a case review hearing. Mr. Perez was supposed to appear by Zoom but failed to do so because of technical difficulties that were not his fault.[17] In the hearing, Ms. Carleton stated that (1) Mr. Perez has maintained contact with the agency, completed his case plan, and visits with NP when he comes to Louisiana; he has also had multiple DCFS-monitored Zoom visits with NP, but despite his efforts it is difficult for him to keep her attention since she is so young (having just turned three years old on October 12, 2025); and (2) the DCFS was trying to "get [Ms. Lopez] involved to see if she could be a possible placement" but she only participated in one of the two DCFS-monitored Zoom calls and did not interact "a whole lot" with NP therein, and only attended two of the three DCFS-supervised visits last time she came to Louisiana, and therein was not doing most of the interaction with NP (Mr. Perez and his sister were). As the DCFS never recommended placement with Ms. Lopez to the court, Ms. Carleton's testimony suggests that the DCFS viewed this supposed underperformance as significantly derogatory — even disqualifying — of her bid for custody of her granddaughter, NP.

On cross-examination, Ms. Carleton testified that the DCFS still — over 4 months after receiving the ICPC report — had not begun making plans to take NP to the Virgin Islands and if she tried to make such a plan,

---

[17] The district attorney requested a bench warrant for Mr. Perez's arrest (for failure to appear), which the trial court issued. However, the DCFS requested that the warrant be recalled on November 12, 2025, because his failure to appear was due to a technical difficulty that was not his fault, as Ms. Carleton explained at the next hearing on January 13, 2026.

she would "probably have to staff that with upper management in the state office before that could happen," because "even though it's a U.S. Virgin Island, it's still not here in the forty-eight.  So it would definitely have to be staffed."  At that point, the court interjected that "*the court has already made it abundantly clear that the court is not allowing the child out of the state*." (However, the court had rendered orders authorizing the foster parents to remove NP from the state for multiple days on at least three occasions.)  No explanation why NP could not visit her family in the Virgin Islands was requested or offered.  The court continued:

> And **so to the extent that Mr. Perez wants to have meaningful visitation or, you know, the ability to have extended time with the child <u>in order to prove that he can be a parent</u>, he's going to have to come to Louisiana, and probably to DeSoto Parish.** (Emphasis added).

Mr. Perez's counsel for that day offered no resistance in the moment and sought no writ to challenge the court's ban on NP visiting her family in the Virgin Islands.

Similarly, counsel for Mr. Perez did not challenge Ms. Carleton's apparent conclusion that Ms. Lopez was no longer a viable placement option (if ever Ms. Carleton so considered her).  Though she did not directly explain, it seems — given the lack of any other "derogatory" matter in the record — Ms. Carleton concluded so because of Ms. Lopez's supposedly inadequate performance in the DCFS-supervised Zoom call with almost three-year-old NP and in the several DCFS-supervised in-person visits between NP, the grandmother, father, and aunt (Mr. Perez's sister).  It also seems Mr. Perez's counsel could have argued (1) that having a DCFS official watching and authoritatively judging one's visit with a forcibly estranged 2- or 3-year-old grandchild would feel high-stakes and quite unnatural for

getting acquainted with the child; (2) Ms. Lopez probably realized that Ms. Carleton was influential in driving that government-enforced estrangement; (3) therefore, Ms. Lopez may not have been her natural self while under the proverbial microscope; (4) Ms. Carleton apparently failed to account for this and, regardless, overweighted her own subjective impression/characterization of the grandmother's interaction as less than satisfactory; and (5) the outcome of a case of such constitutional magnitude should not and cannot be driven by such subjective opinions — but rather, must be determined according to reasonable, articulated standards; i.e., a grandmother performing in a way not completely satisfactory to a DCFS official's personal ideals or whims does not and cannot make that grandmother unsuitable as a custodian of her own grandchild, especially in light of the overall situation and Ms. Lopez's substantial efforts in this matter.[18]

The CASA advocate, Nancy McClellan ("Ms. McClellan"), stated that when she went to the foster home it looked like NP was "thriving," and in conclusion testified as follows:

> Q. Are there any recommendations that CASA would make in this matter?
>
> A. Uh, I did recommend guardianship just because it has been a difficult case. *We can't seem to say that there is not a good reason, or a legal reason…to not reunify. But at the same time, I just can't see taking this child away from everything she knows and taking her off to St. Croix.* (Emphasis added.)

---

[18] E.g., requesting to be subjected to an invasive ICPC investigation, and spending thousands and thousands of dollars on air travel to Louisiana, hotels, and rental cars.

Mr. Perez's counsel waived cross-examination despite the above-emphasized testimony.

At the conclusion of the hearing, the court ordered that reunification be terminated as a concurrent case plan goal, thereby returning the goal to adoption by foster parents only:

> All right. The Court would note that [NP] was removed January 24, 2024. So, the child has been in DCFS custody for close to two years now. About a year and nine months or so. I raised these same concerns when we were here last time. At this time, I am changing——the Court is ordering the case plan goal be changed to adoption only. ***It is apparent from the fact that neither parent is here today.*** Even though there was a Zoom link made available for [Mr. Perez], he did not bother to get on the Zoom link. You know, he may have checked the boxes on a case plan, *but he has not had meaningful contact with this child. Zoom is not meaningful contact. He's not had meaningful contact with the child throughout the life of the case. There is no reason that this child should languish in DCFS custody with any thought of being reunified with parents that apparently don't want her, or **don't want her badly enough that they would come and actually do something to try and get her back***. So, the Court is ordering that the case plan goal be modified to be adoption only. I'm ordering the department to move forward with that. I'm going to put the matter back on the docket for January 13, with the expectation that there will be some meaningful movement before that time by DCFS. (Emphasis added.)

As the only change of circumstances regarding Mr. Perez was his failure to appear by Zoom at this hearing, it follows that such was the court's reason for terminating reunification with the non-offending parent, Mr. Perez, as a case plan goal. Per the request of the DCFS and the district attorney, the court issued a bench warrant for the arrest of Mr. Perez for failure to appear.

However, on November 12, 2025 — at the request of the DCFS — the district attorney requested in open court that the bench warrant issued for the father be recalled. When the court asked if other counsel had input, Mr. Fryer stated that he had "been informed that he [Mr. Perez] is mine." At the

21

January 13, 2026, hearing (discussed below), Ms. Carleton explained that it was a technical difficulty that prevented Mr. Perez from appearing by Zoom that day and that Mr. Perez had contacted her regarding the matter that day.

On January 13, 2026, the court held a permanency hearing which resulted in a judgment: (1) granting permanent guardianship of NP to the Louisiana foster parents; and (2) denying the father, Mr. Perez, any right to visitation. The court based its judgment on the fact that Mr. Perez screened positive for THC that day and the court's factual conclusion that, although Mr. Perez traveled to Louisiana "about six times" to make his DCFS-supervised and monitored visitations with NP, could have financially afforded to have come twice as often as he did — and therefore had not had "meaningful contact" with NP. The court, the DCFS, and Mr. Fryer (Mr. Perez's counsel) were silent regarding the DHS recommendation of permanent placement with Ms. Lopez. However, Mr. Fryer did (finally) introduce the ICPC reports into evidence. There is no indication in the record that the trial court ever read or even had possession of these documents prior to rendering the judgment herein appealed.

Regarding the positive THC screen, Ms. Carleton testified as follows:

> THE COURT: …So, if the child were to remain in DCFS custody today and we have the positive drug screen of [Mr. Perez] what would the agency require of him in order for him to again fulfill the requirements of his case plan?
>
> THE WITNESS: [Mr. Perez] would need to go and have another drug screen—a substance abuse assessment completed. And then follow all recommendations. And even if they do not recommend that he attend some type of substance abuse, the agency is still requesting that all of our parents remain drug-free, including THC.
>
> THE COURT: Okay. So, assuming that he goes to a substance abuse facility and they test him and he again

22

tests positive, then there would be follow-up treatment generally. Is that correct?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. And is there – how long does that treatment generally last?

THE WITNESS: *Most of our parents that go through a substance abuse program it's six to nine months from start to completion.* And when I say completion, that kind of phases them out, from my understanding, to attending AA and to that being on a consistent basis.

THE COURT: Okay. And that is something that the department would be looking for Mr. Perez to do if the child remains in DCFS custody?

THE WITNESS: We would[.] (Emphasis added.)

Later, in its oral reasons for judgment, the trial court stated:

[Mr. Perez] just failed a drug screen today, which means that in order to do all of the things necessary for substance abuse treatment, we're looking at a minimum of six to nine months, and that is if he is compliant. I don't know whether he would be compliant or not. *So, you have* [Mr. Perez]*, who is at a minimum six to nine months away from the ability to even have a discussion about reunification.* And that's ignoring, for a moment, the bonding issues that we have already noted. (Emphasis added.)

Thus, the trial court found that this one THC-positive screen, as a matter of fact, meant that NP could not be safely returned to her father unless and until he successfully completed 6 to 9 months of drug screens and substance abuse treatment; as the court stated, "the child cannot be safely reunified with a parent within a reasonable amount of time. That…has been established…by clear and convincing evidence."

Mr. Perez stated that he would be willing to undergo the 6 to 9 months of substance abuse treatment to maintain his opportunity to have his daughter returned to him and his family.

**Parental bonding, logistics, and finances**

Mr. Perez's testimony indicated that he was intimately involved in NP's daily life until Ms. Fredrick left him in early 2023 and took NP (who was about 4 months old at that time) with her. Mr. Perez went to jail mid-2023. When NP was released from the hospital at the end of January 2024, she went into the physical custody of the foster parents and has so remained ever since. Mr. Perez was allowed one visit which went well according to Ms. Carleton, but was then banned from visiting NP at all, per the DCFS recommendations; this ban was in place for approximately 5 months of the pendency of this case.

At some point after August 5, 2024, Mr. Perez was allowed to start visiting his daughter, NP, again. In her testimony at the January 13, 2026, permanency hearing, Ms. Carleton admitted that Mr. Perez's opportunities for visitation with NP were subject to the following DCFS-imposed constraints: (1) visits had to be supervised and monitored by DCFS staff, and staff's availability was limited by overall caseload, etc.; (2) the visitation had to be at a time of day that did not disrupt NP's schedule; and (3) the longest visit Mr. Perez was ever allowed was 2 hours, and most were limited to 60 or 90 minutes, because the DCFS was worried a longer visit may "overstimulate" NP.

In his testimony, Mr. Perez expressed frustration that the DCFS would not allow him to visit except on their time and that although they told him he would be able to have a DCFS-monitored Zoom call with NP once per week, it was usually only once per month and at best twice in one month. The Zoom calls were, at most, 30 minutes in length.

The results of this physical custody/supervised visitation regime are reflected in Ms. Carleton's testimony. Ms. Carleton testified that she would

24

characterize the relationship between NP and her foster parents, the Lalas, as follows:

> [NP] considers the Lalas her parents. She hasn't known any difference since she left the hospital when she came into care. So, she has known them for two years as her parental units…She knows both sides of the Lalas' family as her family parents. That is who she is comfortable with.

When asked to characterize NP's relationship with Mr. Perez, Ms. Carleton testified:

> A. She knows Mr. Perez. She is familiar with Mr. Perez, I guess is a better way to say it. When he does come for court, he does get visits with her, supervised visits with her. It does take her a while to warm up to him, but then she is comfortable around him. And she does play with him during the visits, but it is more of a person to play with than as a parent.
>
> Q. Would you characterize their relationship as bonded or something comparable to that?
>
> A. I would say [NP] warms up to him and is comfortable. I would not call it a bonded relationship. No.

Essentially, Ms. Carleton, the trial court, and the district attorney all asserted that Mr. Perez just did not do enough to form a bond with NP to have her given back to him. Ms. Carleton's testimony here indicates that she believed NP forming a parent-child bond with Mr. Perez was and should be a prerequisite to their reunification, i.e., a condition that had to be fulfilled prior to possible reunification. Nonetheless, Ms. Carleton admitted that the DCFS had not done anything to assist Mr. Perez in his efforts to come to Louisiana to re-bond with his child

As previously mentioned, after receiving the (Virgin Islands) DHS recommendation of permanent placement with Ms. Lopez (May 28, 2025), Ms. Carleton stated that the DCFS was considering allowing NP to visit her father and family in St. Croix. However, in response, the *trial court*

prohibited all such visits, and *any other* removal of NP out of Louisiana (except by the foster parents). In her testimony at the January 13, 2026, permanency hearing, Ms. Carleton admitted that she never discussed the possibility of returning NP to Mr. Perez or placement with Ms. Lopez with the Virgin Islands DHS, notwithstanding the DHS recommendation of permanent placement with Ms. Lopez in the ICPC report.[19]

In its oral reasons for judgment, the trial court *explicitly* found that Mr. Perez could have afforded to travel to Louisiana for twice as many visits with NP as he did and found that his failure to do so weighed against reunification and in favor of awarding permanent guardianship of NP to the foster parents. In his testimony at the permanency hearing, on direct examination, Mr. Perez testified that it cost him about $2,000 per trip to Louisiana – i.e., airline tickets, ground travel, plus food and lodging for 3 to 4 days. Thereupon, the following exchange occurred:

> Q. Financially, were you capable of making any more trips to the United States?
>
> A. Yes. Yes. Not like--no. Not like--only this trip like once a month. Every twenty-some--can only make one trip. I just not understand the question. It's hard.
>
> THE COURT: And let me just make sure I understand your answer. You could afford to come every other month. Is that what you're saying?
>
> THE WITNESS: So, like I could try and make--see, last month I been here for December, which is the next month. It was kind of hard, but I still needed to make it happen. Yeah.
>
> THE COURT: Okay. I just want to make sure what your response to your attorney was, which was that you could afford to do it every other month?

---

[19] She stated that her contact with the Virgin Islands DHS officials was limited to inquiring whether there were any CINC-related proceedings concerning NP, Ms. Fredrick, or Mr. Perez at the beginning of the instant matter.

THE WITNESS: Uh, no. Once I have court, I will be here for my child. Put it like this--like it's kind of hard. If I try to come here like January, February, it would be--see, like January, February, March, you know. Like a month in between. Yeah.

THE COURT: So, every other month?

THE WITNESS: Yeah.

Even though Mr. Perez had just said he did not understand the initial question by his attorney and had otherwise answered that question unintelligibly,[20] the court interjected with a leading question that furnished an answer clearly against Mr. Perez's interests.  Mr. Perez's first answer to the court's leading question was unresponsive – i.e., it did not accept or reject the court's suggestion to him of what Mr. Perez was trying to say.  When the court again suggested that Mr. Perez meant to say he could have come to Louisiana every other month, he responded with "Uh, no.  *Once I have court,* I will be here for my child…Like a month in between. Yeah." (Emphasis added.)  Then, on the court's third time making this suggestion, he simply agreed.  On this basis alone, the court found as a matter of fact that Mr. Perez could have traveled to Louisiana twice as often as he did – i.e., eight to twelve trips of 3 or 4 days at $2,000 each, rather than the 4 to 6 such trips he actually made.  For Mr. Perez, that would constitute an additional $8,000 to $12,000 dollars spent on travel and an additional 12 to 24 days of not being able to earn money at work over a 17-month period.

On cross-examination, Mr. Perez reaffirmed the financial difficulty of traveling to Louisiana, explaining that he has other obligations and expenses, such as groceries, bills, and his other daughter, and so, of necessity, he has been "saving up *just* for the court trips." (Emphasis added.)  It also bears

---

[20] It seems from this exchange and the rest of Mr. Perez's testimony that he may have needed an interpreter.

mention that Mr. Perez was assigned a support obligation of only $15 per month in his case plan, had appointed counsel(s) throughout the case (which are only available to *indigent* parents under La. Ch. C. art. 608), and lives in a container home that he and the Virgin Islands DHS agree would be too small to house him and NP.

In its oral reasons for judgment, the court stated that it relied, in part, on the reasons offered by the state in its closing argument. The state, in pertinent part, contended:

> It's also a concern that Mr. Perez has not been able to form a bond with [NP] that is comparable to the bond that the child has with the…[foster] family. That has been documented throughout the case …So, this is a child who, according to Mr. Perez's testimony, she last had consistent contact with him when she was four, five, or six months old. Since then, it has been very sporadic contact. And for …[NP] to be -- at this point, to contemplate her returning to the island of St. Croix, it would be to functional strangers. I know that's probably hard for Mr. Perez to hear. I think that he has done what he can. But the reality is that you have a three-year-old child who is -- who is bonded.
> …
> Based on what…[Mr. Perez] has testified to today, he's done the best he can with coming to the U.S. and visiting…[NP] when he can. He said it's not possible for him to do more. It's not possible for him to come to this part of the world and spend an extended amount of time where he can, on a practical basis and at a pace appropriate for a three-year-old, get to know her and bond with her. What is in the best interest of [NP] is for her to be placed in a guardianship with the…[foster] family.

Finally, the trial court refused to grant Mr. Perez a judicially enforceable right to visit his daughter while she is under permanent guardianship, and ordered that his visitation with NP, if any, be left to the discretion of the permanent foster parents who desire to adopt her.

**Assignments of error**

Mr. Perez makes the following assignments of error:

1. The trial court erred in its determination that guardianship was in the child's best interests and the least restrictive disposition.

2. The trial court erred in its determination that reasonable efforts were made by DCFS to reunify the family.

3. The trial court erred by delegating its authority over visitation to the guardian, rather than establishing a defined and enforceable visitation plan.

# LAW

**Standards of review**

Whether a parent has complied with a case plan, the expected success of rehabilitation, and the expectation of significant improvement in the parent's condition or conduct are all findings of fact reviewed under the manifest error standard. *State ex rel. J.T. v. J.M.*, 46,090 (La. App. 2 Cir. 12/12/10), 56 So. 3d 1009. To reverse a trial court's permanency plan determination, an appellate court, ordinarily, must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Int. of R.W.H.V.*, 53,065 (La. App. 2 Cir. 9/25/19), 281 So. 3d 800, 806–07.

However, appellate courts review questions of law *de novo*, i.e., without deference to the lower court. *DePhillips v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 19-01496 (La. 7/9/20), 340 So. 3d 817. Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine the facts for itself. *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731, 735. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law

29

skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is *required*, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo. Id.*

Strict scrutiny review applies to governmental infringements on fundamental rights. "The Fourteenth Amendment forbids the government to infringe fundamental liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 2268 (1997).[21] Courts are to construe legislation to preserve its constitutionality:

> [B]ecause it is presumed that the legislature acts within its constitutional authority in promulgating a legislative instrument, this court must construe a legislative instrument so as to preserve its constitutionality **when it is reasonable to do so**. In other words, if a legislative instrument is susceptible to two constructions, one of which would render it unconstitutional or raise grave constitutional questions, the court will adopt the interpretation of the legislative instrument which, **without doing violence to its language**, will maintain its constitutionality. (Internal citations omitted; emphasis in original).

*In re Dennis*, 55,851 (La. App. 2 Cir. 7/17/24), 400 So. 3d 954, 962.

**Constitutional precepts**

**Substantive Due Process.** "[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State." *Parham v. J. R.*, 442 U.S. 584, 99 S. Ct. 2493 (1979). On the contrary, the biological parent's interest "in the care, custody, and control of their children — is perhaps the oldest of the *fundamental liberty interests* recognized by…[the

---

[21] Emphasis in original; internal quotation marks omitted.

United States Supreme] Court."[22] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059–60 (2000). "The liberty interest in family privacy [which includes biological parent-child relations] has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 843–45, 97 S. Ct. 2094 (1977). That is, parental rights are antecedent to government and its laws, and older than the constitution itself.[23]

The plurality in *Troxel*, *supra*, held unconstitutional *as applied* a statute giving "any person" the right to petition for visitation rights "at any time," and authorized the court to grant such rights whenever "visitation may serve the best interest of the child." In that case, the mother and father were unmarried and terminated their relationship after having two children together. The father then began living with his parents (the paternal grandparents), and "regularly" brought the children to their house for weekend visitation. However, the children's father died and, thereafter, the mother informed the paternal grandparents that their visitation would be substantially reduced. The grandparents sued for greater visitation pursuant to the abovementioned statute and the trial court in part granted their petition. The plurality held that the trial court created an application of the statute that impermissibly infringed on the mother's parental rights in that (1) the mother's own determination of the children's best interests was given no "material weight"; and (2) conversely, the trial court seemed to presume

---

[22] Emphasis added.

[23] The United States Supreme Court has equated the biological family relationship between parent and child with marriage, i.e., "a right of privacy *older than the Bill of Rights…*and intimate to the degree of being sacred."

31

that the visitation beyond what the mother determined appropriate was in the children's best interests. Additionally, the plurality criticized the trial court's articulated justification for its ruling, stating that such showed "that this case involves nothing more than a simple disagreement between the Washington Superior Court and Granville concerning her children's best interests." *Id*. at 2063.[24] The plurality made clear that the mother's parental fitness was not in question — and indicated that a parent is fit so long as he or she "adequately cares for his or her children." *Id*. at 2061.

Justice Souter, in his concurring opinion, would have held the state statute *facially* unconstitutional because "the statute's authorization of 'any person' at 'any time' to petition for and to receive visitation rights subject only to a *free-ranging best-interests-of-the-child standard*…sweeps too broadly and is unconstitutional on its face." *Id.* (Emphasis added.)[25]

**Procedural Due Process**. In procedural due process analysis, "there must be determined 'what process is due' in the particular context." *Smith, supra,* at 847. "'[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 902 (1976). Rather,

---

[24] The plurality also agreed with Justice Kennedy's remark in his dissenting opinion that "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.'" *Id*. at 2065. Justice Thomas, in his concurring opinion, observed that the plurality failed to state the standard of review it was applying, and added that he would apply strict scrutiny to the infringement of fundamental rights, and that the state had no legitimate governmental interest supporting its infringement on the mother's parental rights.

[25] However, due process protects *from government interference* the rights of biological grandparents. *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 505, 97 S. Ct. 1932, 1938 (1977), states: "Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of…grandparents sharing a household…with parents and children…[is] deserving of constitutional recognition." *Id.* at 503–05.

"[d]ue process is flexible and…[requires] such procedural protections as the particular situation demands." *Id.* Thus, *Mathews* states that:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: …[1] the private interest that will be affected by the official action; *…*[2] *the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards*; and…[3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (Emphasis added.)

*Id.* In a CINC-type case, "the private interest…of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection…[T]he interest of a parent in the companionship, care, custody, and management of his or her children 'come(s) to this Court with a momentum for respect [which, in contrast, is] lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212 (1972). The degree and duration of potential deprivation that may be created by a particular decision are important factors to be considered in assessing the validity of any adjudicative process.[26] *Mathews, supra.* *Mathews* also considered "the reliability and fairness" of existing procedures as relevant to assessing the risk of erroneous deprivation. *Mathews*, *supra*.

Federal and Louisiana cases have addressed specifically the procedural due process validity of judicial proceedings infringing on

---

[26] Courts have sometimes aptly referred to terminating parental rights as a "civil death penalty," *see, e.g.*, *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. 2004); *In re K.D.L.*, 118 Nev. 737, 58 P.3d 181, 186 (2002). The stringency required by due process, accordingly, is beyond ordinary standards for civil cases.

parental rights.  *Stanley*, *supra*, held that a state law which presumed unwed

fathers to be unfit parents upon death of the mother and placed their children

in guardianship indefinitely violated the father's due process right to a

hearing before his children could be taken from him.  Additionally, the

state's presumption of unfitness likewise violated due process, which the

court held requires a hearing wherein the state has the burden of *proving*

unfitness and the court, based on evidence in the record, determines whether

the state carried its burden of proving parental unfitness.  There must be

individualized evidence of unfitness, which does not include stereotypes or

broad classifications.  *Id.*

In *In Int. of Howard*, 382 So. 2d 194, 199–200 (La. App. 2 Cir. 1980),

this court held that "both the federal and state constitutions requires that

counsel be furnished at state expense to indigent parents faced with charges

of neglect and the possibility of removal of their child from their custody for

an indefinite or prolonged period of time."[27]  Similarly, *M.L.B. v. S.L.J.*, 519

U.S. 102, 143, 117 S. Ct. 555, 577 (1996), held that procedural due process

invalidated a state law as applied in denying the challenger the opportunity

to appeal a judgment terminating her parental rights because she could not

prepay the cost of the record for appeal.[28]

**Children's Code**

---

[27] This principle is now codified in La. Ch. C. art. 608, which provides that the parent of a child who is the subject of a CINC proceeding has the right to counsel and that it attaches at the onset of the proceedings (i.e., instanter order of removal, or if none, upon filing a petition).

[28] The implications of this case, however, are broader: these constitutional provisions may invalidate state proceedings with severe consequences for parental rights if the proceedings are structured in such a way that the parent's indigence disables him from compliance with case plan requirements or judicial expectations.

The Louisiana Children's Code was written with these constitutional boundaries in mind and explicitly affirms the legislature's intent for it to be construed and applied within those boundaries. La. Ch. C. art. 102 provides that the Children's Code:

> shall be liberally construed to the end that each child *and parent* coming within the jurisdiction of the court *shall be accorded due process* and that each child shall receive, preferably in his own home, the care, guidance, and control that will be conducive to his welfare. In those instances when the child is removed from the control of his parents, the court shall secure for him care as nearly as possible equivalent to that which the parents should have given him. These Code provisions shall be construed to promote the stability of the family; to secure simplicity in procedure, fairness in adjudication and administration, and the elimination of unjustifiable delay[.] (Emphasis added.)

The purpose of Title VI of the Children's Code, Child in Need of Care ("CINC") law and procedure, is "to protect children whose physical or mental health, welfare, and safety is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others." La. Ch. C. art. 601. *This is the threshold justification for CINC proceedings.* Once that threshold is crossed, "[t]he health, welfare, safety, and best interest of the child shall be the paramount concern in all [CINC] proceedings... Title [VI] shall be…administered and *interpreted to avoid unnecessary interference with family* privacy and trauma to the child, and yet, at the same time, authorize the protective and preventive intervention needed for the health, welfare, safety, and well-being of children." *Id*. (Emphasis added.)

La. Ch. C. art. 718 states that the law of guardianship is "intended to ensure the fundamental needs of children are met and the constitutional rights of all parties are recognized and enforced." La. Ch. C. art. 722 sets

forth the elements that must be proved to authorize the court to order that the

child be kept in guardianship, and requires that they be proved by clear and

convincing evidence:

> (1) The child has been adjudicated to be in need of care.
> (2) Adoption is not in the best interest of the child and ***the child cannot be <u>safely</u> reunified with the parent within a reasonable time.***
> (3) The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.
> (4) The proposed guardian is able to provide a stable and safe home for the child for the duration of minority.
>
> …

All of the elements except "the child cannot be *safely* reunified with the

parent within a reasonable time" are clearly established.

La. Ch. C. art. 603 defines certain terms and phrases used in Title VI

of the Children's Code.  Pertinent to proper understanding of the above-

emphasized language in La. Ch. C. art. 722(A)(2) are the following

definitions:

> (29) "Safe" and "safety" mean the condition of not being unsafe. Whether a child is unsafe shall be determined by the particular facts and circumstances of each case, including consideration of the *threat of danger* to the child, whether the child is vulnerable to the threat, and the parent's or caretaker's protective capacity to manage or control the threat.
> …
>
> (31) "Threat of danger" exists when the behavior of a parent or caretaker or the family situation indicates serious harm, in the near future, to the child's physical, mental, or emotional health, welfare, and safety. (Emphasis added.)

La. Ch. C. art. 603.

## ANALYSIS

The trial court committed reversible error in granting permanent guardianship to the Louisiana foster parents, and in not granting permanent guardianship to Beatris Lopez, the paternal grandmother of NP.

Pursuant to La. Ch. C. art. 722, it is the state's burden of proving by clear and convincing evidence that NP cannot be safely returned to Mr. Perez within a reasonable amount of time. However, the trial court explicitly reversed the burden of proof, insisting that Mr. Perez would have to come to Louisiana and "prove he can be a parent" *before* the court would return his daughter to him. This is an error of law which violates not only La. Ch. C. art. 722, but also, due process under *Stanley v. Illinois*, *supra*.

The trial court found that Mr. Perez failed to prove he can be a parent because he did not travel to Louisiana to visit NP "enough" times (four to six), did not have a parent-child psychological bond with NP by the time of the permanency hearing, and because he failed one drug screen, testing positive for THC. In addition to reversing the burden of proof, this imparts meaning to La. Ch. C. art. 722(A)(2) that its language cannot bear (especially given La. Ch. C. art. 603(29) and (31)) and further distorts the factfinding process. The trial court's errors of law have interdicted the factfinding process to such a degree that this court is required to conduct *de novo* review pursuant to *Evans v. Lungrin*, *supra*. Regardless, the result is the same whether we apply de novo or manifest error as the standard of review. Furthermore, this court is required to render judgment because the record is sufficient for doing so. *Id.*

***Only four to six trips to Louisiana; insufficient bonding.*** The fact that Mr. Perez only flew in from the Virgin Islands on four to six occasions

37

and visited with NP has little or no tendency to prove that NP cannot be safely returned to him within a reasonable time or otherwise — that this conduct of Mr. Perez "indicates serious harm, in the near future, to the child's physical, mental, or emotional health, welfare, and safety." La. Ch. C. arts. 722(A)(2), 603(29), and 603(31).

Furthermore, the fact that Mr. Perez made only four to six trips to Louisiana formed the basis for trial court's conclusion that there is a lack of "bonding" (or *re-bonding*) between NP and her father. Using this supposed lack of *re-bonding* as a basis for awarding permanent nonrelative guardianship to Louisiana foster parents is not authorized under relevant Children's Code provisions. To construe the code's definition of "threat of danger" to include the emotional effects of separation from foster care is to ignore the requirement that the biological parent's behavior or the "family situation" into which the child would go *be the cause* of the threatened emotional harm. La. Ch. C. art. 603(31). Moreover, such would render La. Ch. C. arts. 722, 603(29), and 603(31) at odds with "[t]he purpose of …Title [VI, which] is to protect children whose physical or mental health, welfare, and safety is substantially at risk of harm *by physical abuse, neglect, or exploitation* and who may be further threatened by the conduct of others." (Emphasis added.) The risk of NP missing her foster parents upon being united with her biological family is real and emotionally stirring, but is not within the grammar, purpose, or effect of La. Ch. C. art. 722(A)(2).

The trial court's bonding/re-bonding metric in this case is also gravely problematic constitutionally because the trial court itself *created* a powerful barrier between Mr. Perez and his daughter, NP. First, the trial court banned him completely from visitation for months — while knowing he was the

38

non-offending parent and had no role in the reasons NP was adjudicated a CINC. Next the trial court only allowed DCFS-supervised visitation, and refused to allow NP to visit her father (and her family) in the Virgin Islands — even after the DHS recommended placement with her paternal grandmother. The trial court specifically stated that Mr. Perez would have to come "to Louisiana, and probably De Soto parish" to visit his child. These orders had a whipsaw effect: they stifled Mr. Perez's re-bonding with NP *and correspondingly* increased NP's bonding with the foster parents. Due process requires fundamental fairness of CINC proceedings, *Mathews v. Eldridge, supra,* and there is nothing fair about this metric used by the trial court in this case — its own questionable orders authoritatively stifled re-bonding between a father and his child.

Moreover, this metric also creates other constitutional hazards where, as a matter of statutory interpretation, there need be none. This metric combined with these orders stifling contact between Mr. Perez and NP quite plausibly creates an unacceptable risk of erroneous deprivation under *Mathews v. Eldridge, supra,* and an unacceptable economic barrier to reattainment of parental rights under *M.L.B. v. S.L.B*, *supra.* Therefore, the constitutional avoidance doctrine would still prohibit the trial court's interpretation of La. Ch. C. art. 722 even assuming, *arguendo,* it could be stretched this far grammatically (which it cannot). The trial court's interpretation of La. Ch. C. art. 722 inverts the constitutional avoidance principle we recently reiterated in *In re Dennis*, *supra*.

Simply put, Mr. Perez's number of visits from overseas — even if unsatisfactory to the trial court's personal ideals — has no bearing on whether his behavior poses a "safety" concern or a "threat of danger" to NP,

or more simply, an indication of "serious harm, in the near future, to the child's physical, mental, or emotional health, welfare, and safety." La. Ch. C. arts. 722(A)(2), 603(29), and 603(31). It also likely violates the narrow-tailoring requirement of *Washington v. Glucksberg, supra*.

*Positive screen for THC.* The evidence in the record supports: (1) that Mr. Perez had only one positive screen for marijuana ("THC"); (2) that DCFS assigned him substance abuse assessment/treatment as a boilerplate item in his initial case plan; and (3) that he completed all requirements of his case plan several months prior to testing positive for THC at the January 13, 2026, hearing. As a matter of fact, and law, one positive THC test, alone, does not and cannot constitute clear and convincing evidence that a child cannot be safely returned to her non-offending parent immediately. Furthermore, such cannot support a finding of *abuse* of THC as opposed to mere *use* of it. Recreational THC use is legal in the Virgin Islands.[29] "Medical" marijuana use is legal in Louisiana. Therefore, THC use must be distinguished from illicit drug use. Moreover, NP was *not* in Mr. Perez's presence, care, or custody at the time he must have consumed the THC. Because there is zero nexus between Mr. Perez's (single) THC use and his parenting of NP, there is, to understate, zero showing of a "safety" concern or "threat of harm" (as must be proven by clear and convincing evidence before the court can validly order guardianship). This amounts to manifest error and/or erroneous interpretation of La. Ch. C. arts. 722, 603(29), and 603(31), in a manner akin to the previous discussion regarding the number of trips Mr. Perez made to Louisiana.

---

[29] 19 V.I.C. § 774 *et seq*., especially § 785.

Nonetheless, the trial court indicated that, because of Mr. Perez's positive THC test, his completion of the additional 6 to 9 months of substance abuse treatment would be prerequisite to any chance of his reunification with NP.  On the facts of this case, the imposition of such a barrier between parent and child is intolerable as a matter of due process. *Troxel*, *supra*; *Smith*, *supra*; *Mathews*, *supra*; *Stanley*, *supra*.

Nothing in the record indicates that the DCFS had specific grounds to suspect that Mr. Perez had a clinical substance abuse problem when it made substance abuse treatment/assessment a part of his initial case plan — and, clearly, his theoretically possible THC use had nothing to do with the reasons the trial court adjudicated NP a CINC.  On this point, Ms. Carlton (DCFS supervisor) testified that "we request [i.e., require] all parents [i.e., including non-offending parents] to be completely drug free, including THC," and that Mr. Perez would have to complete 6 to 9 months of additional treatment because he tested positive for THC on January 13, 2026.  Thus, the initial reason for requiring substance abuse assessment/treatment as a condition of Mr. Perez's reunification with NP is that the DCFS categorically imposes such requirements on *all* parents involved in CINC proceedings without any individualized justification.  A CINC adjudication, alone, does not grant DCFS license to engage in a fishing expedition into the privacy of a non-offending parent whose action/inaction played no role in creating the grounds for the adjudication in the first place.

**Father's arrests and mother's restraining order against him.**
Finally, we turn to the facts that actually do raise a safety concern regarding Mr. Perez, which the trial court did not address: his RAP sheet.  Critically, it

is nowhere suggested that Mr. Perez ever abused any child. The fact of Mr. Perez's arrests and Ms. Fredrick's restraining order against him do not constitute prima facie evidence that Mr. Perez ever committed domestic violence or any crime whatsoever; rather, these matters only justify *caution pending further investigation* as to whether he may have committed violence against Ms. Fredrick or someone else. None of the underlying allegations against Mr. Perez are in the record — neither for the arrests nor for Ms. Fredrick's restraining order against him.[30] This cannot be prima facie evidence that Mr. Perez committed domestic violence against Ms. Fredrick or otherwise, especially in light of her profound lack of judgment and credibility demonstrated in the record of this case.[31] Also, critically, the ICPC report shows that the DHS was aware of the proximity of Mr. Perez's residence to that of his mother, Ms. Lopez, and Mr. Perez's arrests, when it recommended NP's placement with Ms. Lopez *and* supervised visitation rights for Mr. Perez. Thus, Ms. Fredrick's restraining order against Mr. Perez (and his pending criminal matters) warrant caution until further investigation — which was reflected in the DHS recommendation that Mr. Perez have supervised visitation.

---

[30] Ms. Carleton testified at the continued custody hearing that Ms. Fredrick "had her paperwork" for the restraining order against Mr. Perez, but that paperwork is not in evidence or otherwise in the record of this case. Ms. Fredrick also allegedly indicated to Ms. Carleton that the ground for the restraining order and Mr. Perez's incarceration was his "domestic violence" against her (Ms. Fredrick).

[31] Likewise, the mere existence of Ms. Fredrick's restraining order against Mr. Perez is not prima facie evidence that Mr. Perez committed physical violence upon the person of Ms. Fredrick. Because the record contains no information regarding the order other than its existence, it cannot be validly concluded that the order is the product of adversarial judicial adjudication on the merits, i.e., as opposed to issuance because of default or consent.

The DHS issued its recommendation of placement with Ms. Lopez and supervised visitation rights for Mr. Perez on May 28, 2025. However, the trial court was silent regarding this matter throughout the remainder of the case, including the trial court's omission from the reasons for judgment granting guardianship to the foster parents. Likewise, none of Mr. Perez's various attorneys ever moved to introduce the DHS recommendation into evidence before the final hearing. Placement with Ms. Lopez was never a case plan goal. At no point did Mr. Freyer or any of Mr. Perez's other attorneys argue that NP should be placed with the paternal grandmother as recommended by the DHS and as requested by Mr. Perez himself.

At this point, we consider the recommendations of the DHS in light of the Children's Code. It is necessary to place this recommendation in procedural chronology. Obviously, the trial court was legally correct in granting the instanter order of removal, adjudicating NP a CINC, placing her with the local foster parents for the entire duration of her physical healing, and banning Ms. Fredrick and Mr. Granville from all contact with NP. The testimony of Ms. Carleton indicates that NP was fully healed as of April 2024. The Virgin Islands DHS home study on Ms. Lopez began on August 22, 2024, but was not finalized until approximately 9 months later, on May 28, 2025. The next case plan was filed on June 11, 2025. It states that the "ICPC was approved" and "the Agency is awaiting on [sic] upper management to move forward with the next step." It also states that Mr. Perez completed his case plan, frequently contacts the agency for updates on his case, and could not attend the next court date in person because he had just gotten a new job. Nonetheless, the "The Agency…[recommended] that custody of [NP] be maintained by the Department of Children and Family

43

Service, with a case plan goal of **ADOPTION/REUNIFICATION.**[32] That is, adoption by the Louisiana foster parents or placement with Mr. Perez.

La. Ch. C. art. 675, which governs case plans, states in paragraph (A):

> The case plan shall be designed to achieve placement in the *least restrictive, most family-like*, and most appropriate setting available, *and in close proximity to the parents' homes*, consistent with the best interest and special needs of the child. The health, welfare, and safety of the child shall be the paramount concern in the development of the case plan. (Emphasis added.)

This provision was not enacted in a vacuum. Rather, just as the rest of the Children's Code, La. Ch. C. art. 675 "shall be…construed so that each parent…shall be accorded due process[,]…that each child shall receive, preferably in his own home…care…conducive to his welfare[,] [and to] promote stability of the family." La. Ch. C. art. 102. The purpose of Title VI of the Children's Code, to which La. Ch. C. art. 675 belongs, "is to protect children whose…health, welfare, and safety is substantially at risk of harm by physical abuse, neglect, or exploitation." La. Ch. C. art. 601. This is the threshold justification for the government's intrusion into parent-child relations. Title VI, and thus La. Ch. C. art. 675, "shall be administered and interpreted to avoid unnecessary interference with family and unnecessary trauma to the child." La. Ch. C. art. 601. Correct application of La. Ch. C. art. 675 is guided by these precepts.

***Least restrictive, most appropriate and family-like, and in close proximity to parent's home(s).*** Clearly, Ms. Lopez's residence is closer to Mr. Perez's residence than to that of the Louisiana foster parents, and is the

---

[32] The October 2025 case plan report repeats the quoted language and adds that the agency has been facilitating and monitoring Zoom calls between Mr. Perez, NP, and Ms. Lopez.

least restrictive, most family-like arrangement.  Conversely, guardianship by the foster parents is categorically beyond the "most restrictive" — practically, it would be very close to the "civil death penalty" for Mr. Perez's parental rights, as it places an ocean between him and his daughter.

*Consistent with the best interest and special needs of the child; health, welfare, and safety paramount.*  After NP was fully healed, the ICPC report recommended permanent placement with Ms. Lopez.  To say the least, this weighs heavily against any assumption that NP's health, safety, or welfare would be "placed substantially at risk of harm by physical abuse, neglect, or exploitation" due to placement with her paternal grandmother. La. Ch. C. art. 601.  Mr. Perez's unresolved criminal matters are the only factor potentially derogatory to placement with Ms. Lopez that is disclosed by the record.  This concern is alleviated, however, by the fact that: (1) the Virgin Islands DHS was aware of Mr. Perez's criminal matters and the proximity of his home to that of Ms. Lopez when it recommended placement with her in the ICPC report; (2) the Louisiana DCFS requested to make reunification with Mr. Perez a case plan goal upon receiving the ICPC report; and (3) the Virgin Islands criminal court has been allowing Mr. Perez to travel to Louisiana to visit NP despite his pending criminal matters and bail obligations.  Moreover, Mr. Perez's determination — that NP's best interest is being raised by her paternal grandmother rather than Louisiana foster parents — may not carry as much weight given that he has unresolved criminal matters, but it does remain constitutionally relevant. *Troxel, supra.*

The record bears no affirmative evidence that Ms. Lopez or Ms. Montanez (or their household) would in any way place NP at risk – in fact, the ICPC report goes satisfactorily far toward negating that concern.  Stated

45

conversely, aside from the above, no substantial evidence in the record militates against a finding that placement with Ms. Lopez would be consistent with NP's best interest.[33]  Moreover, La. Ch. C. art. 675 does not state or imply that establishment or re-establishment of parent-child psychological bonding (or its grandparental equivalent) — to the satisfaction of the DCFS supervisor, trial court, or otherwise — is a prerequisite to direct reunification with a non-offending parent or kinship placement.

In this case especially, engraftment of such a bonding prerequisite via "best interest" analysis would nullify the legislation's mandatory preference for the placement that is "most family-like," "least restrictive," and in "close proximity to parents' homes." La. Ch. C. art. 675(A).  It would also overreach the purpose of CINC law and procedure, which is "to protect children whose physical or mental health, welfare, and safety is substantially at risk of harm by physical abuse, neglect, or exploitation," and would constitute an "unnecessary interference with family." La. Ch. C. art. 601. Finally, it would breach the legislative parameter of construing the Children's Code "to promote stability of the family; to secure simplicity of

_____

[33] Ms. Carleton's notion that Mr. Perez and/or Ms. Lopez would have to establish a parental bond with NP via visitations in Louisiana — which were required to be scheduled, monitored, and graded by the DCFS — as a prerequisite to even allowing visitation in the Virgin Islands contradicts the meaning and inverts the purpose of La. Ch. C. arts. 102, 601, and 675, as detailed above, and runs counter to due process principles articulated in *Troxel, supra*; *Stanley, supra;* and *M.L.B., supra.*  Where, as here, there is no showing that such placement would be against the child's health, safety, or welfare, such placement is mandatory.  Moreover, the DCFS and trial court have, by exercise of governmental power, made the "prerequisite" parent/grandparent-child visits extremely costly and disruptive for working people such as Mr. Perez and Ms. Lopez.  They may easily have become financially insolvent, lost their jobs, and/or had to neglect other serious family obligations if they had come and done enough DCFS monitored, scheduled, and graded visits to satisfy Ms. Carleton and the trial court.  Such risks forcing a trade-off that is repugnant to due process.  *M.L.B. v. S.L.B., supra*; *Mathews v. Eldridge, supra.*

procedure, *fairness in adjudication*, and the elimination of unjustifiable delay." La. Ch. C. art. 102. (Emphasis added.)

On these facts, fairness in adjudication is incompatible with such a bonding prerequisite. While removal and foster placement is initially justified as a *temporary* protective measure, it causes bonding with foster parents and correspondingly deteriorates or prevents the biological parent-child bond — and, with the DCFS/trial court's bonding prerequisite, temporary foster placement thereby creates its own justification for being made *permanent*. DCFS time-wasting and inefficiency, as demonstrated in this case, exacerbates this effect. This circularity is dangerous and threatens grave constitutional concerns.[34]

We also find it critically important that permanent placement with Ms. Lopez creates a bridge between NP and her father, that their relationship may continue and grow. Title VI of the Children's Code repeatedly expresses preference for the return of children to their parents, and pending or failing that, placement with suitable relatives, e.g., art. 675(A): "the case plan shall be designed to achieve placement in the *least restrictive*, *most family-like*, and most appropriate setting available, and in close proximity to the parents' homes, consistent with the best interest and special needs of the child." La. Ch. C. art. 622 prioritizes relative placement pending the continued custody determination; La. Ch. C. art. 681 requires, upon

---

[34] Keeping adoption as the case plan goal was plausibly at odds with *Troxel v. Granville*, *supra*, which recognized the primacy of parental rights of a fit parent in determining the best interest of the child between parental and grandparental litigants, and in doing so rejected a free-ranging best interest analysis. This militates *a fortiori* for the primacy of reunification with a non-offending parent over nonrelative guardianship or adoption. Moreover, the narrow-tailoring requirement for infringement on fundamental rights was likely violated by maintaining adoption as a case plan goal at this point. *Washington v. Glucksberg*, *supra*.

disposition, return of the child to the parent if such can be safely done; La. Ch. C. art. 702(A) prioritizes return of the child to the parent above all other permanent placement options. The return of the child to the parent is not an all-or-nothing proposition where, as here, suitable relatives stand ready, desiring, and able to take care of the child as guardian and thereby facilitate a continued relationship between the parent and child. In contexts such as this case, these articles together, and particularly La. Ch. C. art. 675(A), demonstrate a legislative policy of a "come as close to return/reunification as you safely can" where direct and immediate reunification may be incautious. La. Ch. C. arts. 102, 601, 622, 675, 681, and 702. Moreover, such policy avoids constitutionally problematic outcomes. Because (1) the record is profoundly lacking information regarding Mr. Perez's pending charges, (2) the Virgin Islands recommended permanent placement with Ms. Lopez despite knowing about the pending charges *and* Mr. Perez living next-door to her, and (3) the Louisiana DCFS requested reunification with Mr. Perez to be added as case plan goal while knowing about the pending charges, we conclude that affirming the trial court judgment or otherwise denying placement with Ms. Lopez because of Mr. Perez's pending charges creates an constitutionally unacceptable risk of erroneous deprivation of his fundamental right to parent his child. *Mathews v. Eldridge*, *supra*; *Troxel v. Granville*, *supra*; *Evans v. Lungrin, supra.*

For all these reasons, NP should have been taken out of foster care and placed in her paternal grandmother's guardianship expeditiously upon the Virgin Islands DHS May 28, 2025, recommendation in the ICPC report. We hold that such must be done now without delay.

At this point, we turn to the question of Louisiana's continuing jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), which governs whether Louisiana courts have child custody jurisdiction regarding a particular child, and if so, regulates the exercise of that jurisdiction. Thereunder, the child's "home state" generally has the highest claim to jurisdiction. La. R.S. 13:1813.

Home state is defined as:

> [T]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months *immediately before the commencement of a child custody proceeding*. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period. (Emphasis added.)

La. R.S. 13:1802(7)(a). NP lived in the Virgin Islands for approximately one year with her mother before she came to the *contiguous* United States in October 2023. NP was taken into DCFS custody less than six months after arriving in Louisiana. Thus, Louisiana is not NP's home state. Rather, the Virgin Islands is NP's home "state" (i.e., territory). Moreover, Louisiana does not have jurisdiction on any of the other grounds in La. R.S. 13:1813, whereas, the Virgin Islands would have "home state" jurisdiction pursuant to La. R.S. 13:1813 (A)(1). Rather, since January 2024, Louisiana has been exercising temporary emergency jurisdiction pursuant to La. R.S. 13:1816(A): "A court of this state has temporary emergency jurisdiction if the child is present in this state and…it is necessary in an emergency to protect the child because the child…is subjected to…abuse."

La. R.S. 13:1819(A) authorizes a Louisiana court to terminate its jurisdiction on its own motion at any time if it finds: (1) it has become an

49

inconvenient forum; and (2) that a court of another state is a more appropriate forum.[35] We find both in the affirmative and, subject to our decree below, terminate our exclusive and continuing jurisdiction of this case in favor of the court of the Virgin Islands.[36] We request that the court taking jurisdiction in the Virgin Islands conduct, upon a complete record, review of our determination that Mr. Perez may have supervised visitation in light of his pending charges.

## CONCLUSION

For these reasons, the judgment granting guardianship to the Louisiana foster parents, Adam Lala and Savannah Lala, is **REVERSED.** The trial court's termination of Mr. Perez's supervised visitation rights is also **REVERSED.** The trial court's protective order barring Naydeen Fredrick and Shamol Granville from contact with NP is **AFFIRMED** and made indefinite. Permanent guardianship is granted to NP's paternal grandmother, Beatris Lopez, pending verification from the Virgin Islands Department of Human Services recommendation in the ICPC report remains

---

[35] Subsection (B) of La. R.S. 13:1819 directs the court to consider whether it would be appropriate for another state to exercise jurisdiction before deciding to transfer the case; to consider all relevant factors and allow the parties to submit information in that regard. This provision does not squarely contemplate the situation here and strict application would cause unnecessary complexity and delay. As explained throughout this opinion it is most appropriate that the court of the Virgin Islands take jurisdiction in this case, which has already been unnecessarily prolonged. The parties have submitted sufficient information. There are no allegations that Mr. Perez ever abused any child. The Virgin Islands DHS, being much closer to the facts in Mr. Perez's criminal matters, recommended that Mr. Perez be granted supervised visitation and that NP be placed with Ms. Lopez; additionally, the Virgin Islands court is in the best position to observe Mr. Perez's daily conduct.

[36] La. R.S. 13:1819(C) establishes the procedure for transfer: If a court of this state determines…that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper. Again this provision does not contemplate the situation here presented, and strict compliance would cause unnecessary complexity and delay.

current.  The Louisiana DCFS is ordered to properly submit a completed request for that verification within seven days of the rendition of this judgment and to notify this court once such has been done.[37]

**AFFIRMED in part; REVERSED in part; RENDERED.**

---

[37] Mr. Perez is exempt from costs pursuant to La. C.C.P. art. 5186(C).  The state is likewise exempt pursuant to La. R.S. 13:4521(A)(4).